United States Courts
Southern District of Texas
FILED
*February 03, 2022*
Nathan Ochsner, Clerk of Court

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** § § § | |
| **v.** § § § | **Criminal No. 4:22-cr-55** |
| **MATTHEW CLARK,** § § § § | |
| **Defendant.** § | |

## INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times material to this Indictment, unless otherwise specified:

### Relevant Market Background

1. Natural gas was an energy commodity that was traded by buyers and sellers through different types of commercial transactions, including at physical delivery locations throughout the United States.

2. One way to trade natural gas was to buy or sell a "futures contract." A futures contract was an agreement that obligated the contracting parties to buy or sell a product or financial instrument at a fixed quantity and price for delivery at a specific date and time in the future.

3. Futures contracts were traded on "exchanges," which were designated commodities markets regulated by the United States Commodity Futures Trading Commission ("CFTC"). These exchanges included, among others, the New York Mercantile Exchange, Inc. ("NYMEX"), ICE Futures U.S., Inc. ("ICE"), and the Chicago Mercantile Exchange ("CME"). NYMEX, CME, and ICE (together, the "Exchanges") each listed different products for trading, including natural gas futures contracts, and issued and enforced rules for trading on their respective exchanges.

4. "Henry Hub"—a natural gas delivery location (or "hub") near Louisiana's Gulf Coast that connected several intrastate and interstate pipelines—was used as a standard pricing reference for natural gas futures contracts on the Exchanges.

5. The Exchanges offered the opportunity to trade in natural gas futures contracts that were based upon the price of natural gas at the Henry Hub delivery point during specified time periods. This included both natural gas futures contracts that were settled with the physical commodity ("NG") and Henry Hub Natural Gas Last Day Financial Futures Contracts, which were settled financially ("HH").

6. Futures contracts could be traded on the Exchanges either through an open outcry system on a trading floor or "pit," or through electronic platforms operated by the Exchanges. The Exchanges operated their electronic trading platforms through computer servers located in Illinois. In addition, traders could execute futures trades on the Exchanges either directly or through registered brokers who served as intermediaries to match willing buyers and sellers.

7. A "block trade" was a type of privately negotiated futures transaction that was executed apart and away from the open outcry or electronic markets. Block trades were required to be executed at prices that were fair and reasonable, and had to be submitted to the Exchanges after execution for price reporting and clearing purposes.

8. It was unlawful for commodity traders to enter into fictitious sales and transactions that caused any price to be reported, registered, and recorded that was not a true and bona fide price, including noncompetitive, prearranged trades that negated market risk and price competition.

**The Defendant and Other Relevant Individuals**

9. **MATTHEW CLARK**, a resident of The Woodlands, Texas, was employed in various positions at Company B, including as a natural gas trader, Director of East Trading, and President. As an employee of Company B, pursuant to his employment agreements, company policies and procedures, rules of the Exchanges, and CFTC regulations, **CLARK** owed Company B a fiduciary duty, a duty of loyalty, and duty of confidentiality.

10. Mathew Webb ("Webb"), a resident of Houston, Texas, was the owner, president, and a registered "associated person" of Classic Energy, LLC ("Classic Energy"). In this role, Webb worked as a broker for trades placed on behalf of Classic Energy's customers. In addition, Webb established MDW Consulting LLC ("MDW"), which he used to execute trades.

11. John Ed James ("James"), a resident of Katy, Texas, was a natural gas trader and the owner and sole principal of Percheron Capital, LLC ("Percheron").

12. Peter Miller ("Miller"), a resident of Puerto Rico, was a natural gas trader and owner of Omerta Capital, LLC ("Omerta").

13. Lee Tippett ("Tippett"), a resident of Houston, Texas, nominally was employed as a natural gas trader and received payments from MDW and Classic Energy between in or around 2013 and in or around 2019.

14. "Person 1," a resident of Conroe, Texas, was a natural gas trader employed at Company B between in or around 2014 and continuing through at least 2020.

15. "Relative 1," a resident of Houston, Texas, was a relative of **CLARK**.

16. "Relative 2," a resident of Davenport, Florida, was a relative of **CLARK**.

17. "Relative 3," a resident of Houston, Texas, was a relative of **CLARK**.

**Relevant Entities**

18. Classic Energy was a registered brokerage firm in Houston, Texas, operated by Webb, that provided brokerage services in various energy markets in exchange for commission fees, including the facilitation of block trades in natural gas futures contracts between Classic Energy's customers and others in the market. During the relevant period, Classic Energy brokered trades for Company B, Percheron, MDW, and Omerta, among others.

19. Percheron was a trading company incorporated in Texas and based in Houston, Texas. James established Percheron and used it to trade commodity futures. James, through Percheron, placed orders that were brokered by Classic Energy between in or around 2013 and in or around 2014.

20. MDW was a trading company incorporated in Texas and based in Houston, Texas. Webb established MDW and used it to trade commodity futures. MDW operated from the same physical address as Classic Energy.

21. Omerta was a trading company incorporated in Delaware and based in Puerto Rico. Miller established Omerta and used the company to trade commodity futures. Miller, through Omerta, placed orders that were brokered by Classic Energy between in or around 2015 and in or around 2019.

22. "Company B," was an energy company located in Houston, Texas, that engaged in, among other business, the trading of natural gas products in the United States. Company B was a customer of Classic Energy between in or around 2010 and in or around 2019.

23. Green Mountain Energy Services ("GME") was the name of a fictitious entity used by **CLARK** and Relative 1, Relative 2, and Relative 3 to move money as part of the offenses

charged in this Indictment. Relative 1 had a bank account in the name of GME at Bank 1. Relative 2 had bank account x0475 in the name of GME at Bank 2.

24. "Bank 1" was a federally insured financial institution headquartered in Charlotte, North Carolina.

25. "Bank 2" was a federally insured financial institution headquartered in Atlanta, Georgia.

## COUNT 1

**Conspiracy to Commit Honest Services Wire Fraud**
**(18 U.S.C. § 1349)**

26. Paragraphs 1 through 25 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

27. From in or around 2010 through in or around 2019, in the Houston Division of the Southern District of Texas, and elsewhere, the defendant,

**MATTHEW CLARK,**

conspired and agreed with Webb, Tippett, Relative 1, Relative 2, Relative 3, and others known and unknown to the Grand Jury to commit honest services wire fraud, that is, to knowingly and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive **CLARK**'s employer, Company B, of its intangible right to **CLARK**'s honest and faithful services through bribery and kickbacks, transmit and cause to be transmitted, by means of wire communications in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme and artifice to defraud, all in violation of Title 18, United States Code, Sections 1343 and 1346.

## OBJECT AND PURPOSE OF THE CONSPIRACY

28. The object and purpose of the conspiracy was for **CLARK**, Webb, Tippett, Relative 1, Relative 2, Relative 3, and others known and unknown to the Grand Jury to engage in the payment and receipt of bribes and kickbacks for the purpose of enriching themselves.

## MANNER AND MEANS OF THE CONSPIRACY

29. The manner and means by which **CLARK** and his co-conspirators sought to accomplish and did accomplish the purpose of the conspiracy included, but were not limited to, the following:

   a. **CLARK** falsely represented to Company B that he would adhere to company policies which, among other things, prohibited the receipt of bribes and kickbacks.

   b. In his capacity as a trader at Company B, **CLARK** agreed to use Classic Energy and Webb as his broker.

   c. Company B paid commission fees to Classic Energy for each trade that Classic Energy brokered for Company B (the "Fees"). In exchange for **CLARK** sending Company B's trades to Classic Energy, Webb and **CLARK** agreed that Webb would kick back a portion of the Fees to **CLARK**.

   d. To conceal their agreement, Webb agreed to pay **CLARK**'s portion of the Fees to third-party intermediaries, including Tippett, Relative 1, Relative 2, and Relative 3, rather than to make payments directly to **CLARK**.

   e. Relative 1 posed as an employee of Classic Energy principally in order to funnel kickbacks from Webb to **CLARK.** Relative 1 also opened a bank

6

    account at Bank 1 in the name of a fictious entity, GME, which Relative 1 used to funnel kickbacks from Webb to **CLARK**.

  f. Relative 2 established bank account x0475 in the name of GME at Bank 2. Relative 2 was the sole signatory on the account and used it to funnel kickbacks from Webb to **CLARK**. To accomplish this, among other things, Relative 2 pre-signed a book of blank checks that Relative 2 provided to **CLARK**, who later provided the book of blank checks to Relative 3. Relative 3 dispensed the checks to various recipients at **CLARK**'s direction.

  g. Tippett posed as an employee of MDW and Classic Energy, where he functioned primarily to funnel kickbacks from Webb to **CLARK**. To accomplish this, Tippett transferred and sent money to Relative 1, Relative 2, and Relative 3 for the benefit of **CLARK.**

  h. **CLARK** caused the transmission of interstate wires to effect the transfer of kickback payments from Webb to Tippett, Relative 1, Relative 2, and Relative 3 for the benefit of **CLARK**.

30. Throughout the conspiracy, **CLARK** and his co-conspirators agreed to and did engage in acts to conceal the scheme, including with respect to the nature and structure of their financial transactions, methods of communication and documentation, and in their interactions with others, including Company B, market participants, the Exchanges, the CFTC, and law enforcement.

  All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2 THROUGH 4

### Honest Services Wire Fraud
### (18 U.S.C. §§ 1343 and 1346)

31.     Paragraphs 1 through 25 and 28 through 30 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

32.     From in or around 2010 through in or around 2019, the exact dates being unknown, in the Houston Division of the Southern District of Texas, and elsewhere, the defendant,

**MATTHEW CLARK,**

knowingly and with the intent to defraud, devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive **CLARK**'s employer, Company B, of its intangible right to **CLARK**'s honest and faithful services through bribery and kickbacks. On or about the dates identified in the table below, each constituting a separate count of the Indictment, for the purpose of executing the scheme and artifice to defraud, **CLARK** transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, pictures, and sounds, as follows:

| COUNT | APPROX. DATE | WIRE TRANSMISSION |
|---|---|---|
| 2 | April 28, 2017 | Wire transfer of approximately $88,458.00 from Tippett's account x4727 at Bank 1 to GME account x0475 at Bank 2. |
| 3 | Feb. 28, 2018 | Wire transfer of approximately $79,695.18 from Tippett's account x4727 at Bank 1 to GME account x0475 at Bank 2. |
| 4 | Feb. 4, 2019 | Wire transfer of approximately $25,600 from Tippett's account x4727 at Bank 1 to GME account x0475 at Bank 2. |

All in violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT 5

**Conspiracy to Engage in Prohibited Commodities Transactions and Insider Trading**
**(18 U.S.C. § 371)**

33.     Paragraphs 1 through 25 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

34.     From in or around 2013 and continuing through at least in or around December 2018, the exact dates being unknown, in the Houston Division of the Southern District of Texas and elsewhere, the defendant,

**MATTHEW CLARK,**

conspired and agreed with Webb, James, Tippett, Miller, Person 1, and others known and unknown to the Grand Jury to commit certain offenses against the United States, namely,

a.     to engage in prohibited commodities transactions, that is, to knowingly offer to enter into, enter into, and confirm the execution of a transaction involving the purchase and sale of a commodity for future delivery, namely, HH natural gas futures contracts, where the transaction was a fictious sale and was used to cause a price to be reported, registered, and recorded that was not a true and bona fide price, and where the transaction was used and may have been used to (1) hedge a transaction in interstate commerce in the commodity and the product and byproduct of the commodity; (2) determine the price basis of any such transaction in interstate commerce in the commodity; and (3) deliver such commodity sold, shipped, and received in interstate commerce for the execution of the transaction, all in violation of Title 7, United States Code, Sections 6c(a) and 13(a)(2); and

b.     to engage in insider trading, that is, to willfully, in connection with a contract for future delivery on and subject to the rules of a registered entity, namely, HH natural gas futures contracts on and subject to the rules of the Exchanges, directly and indirectly (1) use and employ,

and attempt to use and employ, a manipulative device, scheme, and artifice to defraud; (2) make, and attempt to make, an untrue and misleading statement of a material fact and to omit to state a material fact necessary in order to make the statements made not untrue and misleading; and (3) engage, and attempt to engage, in an act, practice, and course of business, which operates and would operate as a fraud and deceit upon any person, all in violation of Title 7, United States Code, Sections 9(1), 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1.

## OBJECT AND PURPOSE OF THE CONSPIRACY

35. The object and purpose of the conspiracy was for **CLARK**, and his co-conspirators, including Webb, Tippett, James, Miller, Person 1, and others known and unknown to the Grand Jury to enrich themselves by misappropriating and trading on material, nonpublic information belonging to Company B, and by engaging in prohibited commodities transactions to create profits for the personal benefit of the conspirators.

## MANNER AND MEANS OF THE CONSPIRACY

36. The manner and means by which **CLARK** and his co-conspirators sought to accomplish and did accomplish the object and purpose of the conspiracy included, but were not limited to, the following:

   a. In breach of his duties to Company B, **CLARK** misappropriated Company B's material, nonpublic information concerning its trading interest in natural gas futures contracts, including, but not limited to, the timing, quantity, price, and direction of its trading interest (whether to purchase or sell), and any limits to the transactional terms to which Company B would agree (collectively, the "Inside Information").

   b. Further in breach of his duties to Company B, **CLARK** then disclosed, or directed Person 1 to disclose, Company B's Inside Information to Webb, knowing and

intending that Webb would pass along the Inside Information to, and broker a prearranged block trade with, one of the other conspirators, including Miller, who would serve as the counterparty and take the other side of the prearranged block trade. These non-competitive, prearranged block trades negated market risk and price competition, constituted fictitious sales, and caused prices to be reported, registered, and recorded on the Exchanges that were not true and bona fide prices.

c. After obtaining Company B's misappropriated Inside Information, Miller entered into offsetting futures transactions designed to benefit from his unlawful possession of Company B's Inside Information and to generate profits to share among the co-conspirators, including **CLARK**. Periodically, Miller provided **CLARK** with his share of the unlawful trading profits.

d. **CLARK** and his co-conspirators agreed to and did engage in acts to conceal the conspiracy, including with respect to the nature and structure of their unlawful trading and financial transactions, methods of communication and documentation, and in their interactions with others, including their respective employers, market participants, the Exchanges, the CFTC, and law enforcement.

## OVERT ACTS

37. In furtherance of and to effect the object and purpose of the conspiracy, **CLARK** and his co-conspirators committed and caused to be committed at least one of the following overt acts, among others:

   e. On or about February 23, 2017, **CLARK** misappropriated and provided material, nonpublic information about Company B's intent to enter into a block trade to sell 100 contracts of HH natural gas futures to Webb, intending that Webb provide that information to Miller, a prearranged counterparty for that block trade.

11

 f. On or about March 2, 2017, **CLARK** misappropriated and provided material, nonpublic information about Company B's intent to enter into a block trade to buy 125 contracts of HH natural gas futures, intending that Webb provide that information to Miller, a prearranged counterparty for that block trade.

 g. On or about March 8, 2017, **CLARK** misappropriated and provided material nonpublic information about Company B's intent to enter into a block trade to sell 100 contracts of HH natural gas futures to Webb, intending that Webb provide that information to Miller, a prearranged counterparty for that block trade.

 h. On or about March 30, 2017, **CLARK** misappropriated and provided material nonpublic information about Company B's intent to enter into a block trade to buy 100 contracts of HH natural gas futures to Webb, intending that Webb provide that information to Miller, a prearranged counterparty for that block trade.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 6 THROUGH 7

### Prohibited Commodities Transactions
### (7 U.S.C. §§ 6c(a)(2), 13(a)(2))

38. Paragraphs 1 through 25 and 35 through 37 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

39. On or about the dates listed in the table below, each constituting a separate count of the Indictment, in the Houston Division of the Southern District of Texas, and elsewhere, the defendant,

**MATTHEW CLARK,**

knowingly offered to enter into, entered into, and confirmed the execution of a transaction involving the purchase and sale of a commodity for future delivery, namely, HH natural gas futures

contracts, where the transaction was a fictious sale and was used to cause any price to be reported, registered, and recorded that was not a true and bona fide price, and where the transaction was used and may have been used to (1) hedge a transaction in interstate commerce in the commodity and the product and byproduct of the commodity; (2) determine the price basis of any such transaction in interstate commerce in the commodity; and (3) deliver such commodity sold, shipped, and received in interstate commerce for the execution of the transaction:

| COUNT | APPROX. DATE | APPROX. VOLUME | APPROX. PRICE PER CONTRACT | BUYER | SELLER |
|---|---|---|---|---|---|
| 6 | March 8, 2017 | 100 Contracts | $3.001 | Omerta | Company B |
| 7 | March 30, 2017 | 100 Contracts | $3.208 | Company B | Omerta |

All in violation of Title 7, United States Code, Sections 6c(a)(2) and 13(a)(2).

## COUNTS 8 AND 9

### Insider Trading
### (7 U.S.C. §§ 9(1), 13(a)(5), and 17 C.F.R. § 180.1)

40. Paragraphs 1 through 25 and 35 through 37 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

41. On or about the dates listed in the table below, each constituting a separate count of the Indictment, in the Houston Division of the Southern District of Texas, and elsewhere, the defendant,

**MATTHEW CLARK,**

willfully, in connection with a contract for future delivery on and subject to the rules of a registered entity, namely, HH natural gas futures contracts on and subject to the rules of the Exchanges, directly and indirectly did (1) use and employ, and attempt to use and employ, a manipulative device, scheme, and artifice to defraud; (2) make, and attempt to make, an untrue and misleading

statement of a material fact and to omit to state a material fact necessary in order to make the statements made not untrue and misleading; and (3) engage, and attempt to engage, in an act, practice, and course of business, which operates and would operate as a fraud and deceit upon any person:

| COUNT | APPROX. DATE | APPROX. AMOUNT | PRODUCT | APPROX. PRICE PER CONTRACT | BUYER | SELLER |
|---|---|---|---|---|---|---|
| 8 | Feb 23, 2017 | 100 Contracts | May 2017 Henry Hub Financial Last Day | $2.853 | Omerta | Company B |
| 9 | March 2, 2017 | 125 Contracts | May 2017 Henry Hub Financial Last Day | $2.870 | Company B | Omerta |

All in violation of Title 7, United States Code, Sections 9(1), 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1.

## NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c))

1. Pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), the United States gives notice that upon the defendant **MATTHEW CLARK**'s conviction of Counts One, Two, Three, and/or Four of this Indictment, the United States will seek forfeiture of all property, real or personal, which constitutes or is derived from proceeds traceable to the criminal offenses.

2. The United States also gives notice that it will seek a money judgment against the defendant.

3. In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exist, the United States will seek to forfeit any other property of the defendant up to the amount of the money judgment.

A TRUE BILL:

Original Signature on file

_____
FOREPERSON

Jennifer Lowery
United States Attorney
Southern District of Texas

Joseph S. Beemsterboer
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

By: _____
Zahra Jivani Fenelon
Assistant United States Attorney
United States Attorney's Office
Southern District of Texas
Zahra.Fenelon@usdoj.gov
(713) 567-9309 (Fenelon)

_____
Leslie S. Garthwaite
Assistant Chief
Della Sentilles
Trial Attorney
Criminal Division, Fraud Section
Leslie.Garthwaite@usdoj.gov
Della.Sentilles@usdoj.gov
(202) 631-6388 (Garthwaite)
(202) 445-8793 (Sentilles)